IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA:

V.                                          Case No. 21-00066

TYLER PHAM                          :

POSITION ON SENTENCING

Tyler Pham, by and through counsel, submits his position on sentencing.

**Introduction**

There are 12 letters in support attached to this pleading.  There are three debrief reports filed Under Seal.  The reports are relevant to the safety valve issue.  These interview reports are: 1) Tyler Pham's safety valve debrief, 2) a debrief report by a previously sentenced conspirator and 3) a debrief report by another previously sentenced conspirator. The interview reports are filed under seal out of an abundance of caution as they are mostly redacted, but there are some names and other investigative information best kept between the parties and the Court.  We ask these be kept under seal until further order of the Court.

All other similarly situated men in this conspiracy received a sentence of 46 months.  This is the appropriate sentence here.   The first issue as to sentencing is whether Pham is eligible for safety valve and the only point of contention—not necessarily with the government but with probation—is the issue of a leadership role.  As part of our plea agreement, the government has agreed to take no position on aggravating or mitigating role.

Without the probation officer's role enhancement suggestion, Pham qualifies for safety valve. Every single one of the co-defendants qualified for safety valve.   If the Court determines there should be no role enhancement, then Pham qualifies and any mandatory minimum in inapplicable.

The second guideline issue is an enhancement for obstruction.  As the Court may recall, two others in this case also went to Vietnam and then returned to surrender.  These two left Pham there and came back and dumped a fair amount of responsibility on Pham's shoulders. Pham wanted to return for a long time. Counsel was in touch with the government as early as October of 2020.  Pham could not return because he had no travel documents and Covid shut down all travel.

After a significant amount of effort by counsel and the FBI, Pham was finally able to return to accept responsibility. He has done pretty well on his bond conditions. The Court lessened his restrictions at the time of his plea. He honored his commitment, stayed home, worked, took care of his kids, and met with counsel as directed.

Pham asks for a 46 month sentence and voluntary surrender. Please consider this memorandum in support.

The underlying drug guidelines in this case are outrageous and excessive. More importantly, Pham is not a leader and there is no obstruction. Equitable sentencing suggests a 46-month sentence. We appreciate the government's notice/footnote regarding the safety valve issue and a possible amended sentencing recommendation from the United States.

**Sentencing Principles**

Since *United States v. Booker,* 543 U.S. 220 (2005), the federal sentencing guidelines are not mandatory. Imposition of a sentence, or course, is not a mathematical or hypothetical exercise. Sentencing is an exercise in discretion, humanity, and justice.

After consideration of the plea agreement in this case, the Court then "must make an individualized assessment based upon the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *United States v. Hughes,* 401 F.3d 540. 546 (4th Cir. 2005).  A district court should consider all the 3553(a) factors to determine whether they support the sentence requested by a party.  *See Gall,* 552 U.S. at 49-50.   The range in these drug cases is usually enormous and unjust no matter the particular facts and circumstances.

The Section 3553 factors are 1) the nature and circumstances of the offense, 2) the history and characteristics of the defendant, 3) the kinds of sentences available, 4) the guideline range, 5) the need to avoid unwarranted sentencing disparities, 6) the need for restitution, 7) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and provide the defendant with adequate educational and vocational training, medical care and other treatment.  The sentencing court must consider each of these factors in imposing a sentence

sufficient, but not greater than necessary to accomplish the goals of sentencing. *See Kimbrough v. United States,* 552 U.S. 85 (2007).

Imposition of a term of imprisonment is subject to the following limitation: "the court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. Section 3582.  In short, in every case, the district court must consider the 3553(a) factors, including the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.

The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949).  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).

The sentencing guidelines remain in tension with this principle and simply do not incorporate humanity into the determination of an appropriate sentence.

It is now "emphatically clear" the guidelines are guidelines. They are truly advisory. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). This Court should keep in mind that, as the Department of Justice once noted, determining the Guidelines range is no substitute for an independent determination of a sentence that is "appropriate and serves the interests of justice." *See* Gov't Supp. & Amend. Sentencing Memo, *United States v. Roger Stone*, Case No 19 cr -18 (D.D.C. February 11, 2020)(requesting a sentence far less than the "technically applicable" guidelines range, which can result in advisory sentencing ranges that are "unduly high", "excessive" and "unwarranted").

When it comes to drug cases, the reliance upon drug type and quantity has been repeatedly shown to have little correlation to an individual's culpability. *See e.g. United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013). In drug cases, the guidelines recommend sentences tied not to any sound sentencing data but rather to arbitrary numbers set by Congress.

Finally, the guidelines at to methamphetamine are higher than heroin and almost equivalent to fentanyl.  The range here is certainly excessive and not tied to any sound data. And please remember the lab reports do not reflect the actual amount of meth in any of these tablets. The lab only tests for a detectable amount.  This "detectable amount" standard is disappearing in some other jurisdictions.  Courts should consider whether any amount is "usable" or otherwise quantified beyond merely detectable.  Prosecutions for trace or residue amounts in pills, or crack pipes or on a dollar bill will soon be a thing of the past.

**Role in the Offense**

We object to any aggravating role.  Without any aggravating role adjustment, Tyler is eligible for safety valve.  All others received safety valve.

Some of the language in the presentence report is lifted from portions of the government's investigative reports, representations from the previous case agent, and even from pleadings filed by counsel for some of the co-defendants.  However, when one really looks at this case,

it is clear there was no one leader.  This was a partnership in crime with various, equally important participants.  Each person had essential duties and assisted in the distribution.  Tyler may have had a source of supply as his duty, but to label him as a leader is inconsistent with some of the facts and even some of the interviews conducted by the government.

Simply put, Tyler had a source of supply, but others had roles equally important and essential to this brief conspiracy.  The activities only lasted five to six months. The profits were equally split among the primary participants. Pham was not the leader and the burden of proof here is not met.  As stated above, the United States agreed to take no position on this issue per our plea agreement.

The original idea of using the dark web came from Dat Nguyen. Interview reports (referenced here but will be filed under seal out of an abundance of caution) reflect this.  Filed under seal are three interview reports:  Pham, a conspirator debrief, and a second conspirator debrief.

Mr. Pham reported during his safety valve debriefing that Dat Nguyen was originally utilizing the darknet to sell marijuana and other related products.  Pham was asked by Dat and Trieu-Nghi Hoang

Nguyen if he could get Adderall to start selling on the darknet.   *Pham* interview at Page 1.

Thus, the original utilization of the darknet was not by Tyler but was by Dat Nguyen.  Tyler did not have the original idea and the darknet operation (as it related to marijuana) was already in existence and operated by Dat.

The statement by Tyler about the original idea and use of the darknet is confirmed by report number 2.  In that report, the cooperator states "Dat..started the darknet stuff after he moved from Irvine California."  *See* Report Number 2 at Page 1, paragraph 3.

Three individuals then had a meeting to discuss how to put Adderall on the darknet.  These were Tyler Pham, Trieu-Nghi Hoang, and Son Nguyen.  These three had a meeting and all jointly agreed to sell on the darknet following the lead of Dat Nguyen.  A conspirator reported Dat said he did not want to join this group yet "but **Dat Nguyen said that he could show them how to do it so he taught Son Nguyen.**"  *See* Report Number 2 at Page 1, Paragraph 4.

So, the original darknet idea (hatched and operated by Dat) was then adopted by three others.  In fact, Dat actually initiated the operation by showing Son how to do it.  Dat Nguyen, Hoang, and Son Nguyen all received the benefit of safety valve consideration.

Tyler confirms this in his interview report as he reports the plan was to split the profits three ways.   *See* Pham Report at Page 1, paragraph 3.

The equality and varying roles are seen throughout Report Number 2.  The conspirator states "Around January or February of 2019, **they** began to give out free samples through their darknet account."  Son Nguyen even had a separate account.   *See* Report Number 2 at Page 1, Paragraph 5.   The conspirator states at one point "Son Nguyen said he would train the conspirator" and in fact that did happen.  *See* Report Number 2 at Page 3.

Every time they met; they went over the numbers.  Son Nguyen found out that one of the conspirators used money from the joint venture to buy ecstasy.  When this took place, there was a meeting and all of the individuals were there and made a joint decision.  Son Nguyen, Dat Nguyen, Tyler Pham, and Hoang were all present and

they went over the numbers.  According to the debrief, "Dat Nguyen had everyone's numbers."  *See* Report Number 2, Page 3, last paragraph. It was revealed that "company" money was used for the ecstasy.  They all came to a decision about how to pay back the company.

 This case represents a situation in which profits were split, decisions were jointly made, and conspirators branched off to do their own thing without permission.  This was not a situation where Tyler Pham was the leader.  Tyler Pham had the source of supply, but others had equally important roles such as operation of the darknet or keeping track of the profits and numbers, and/or training others.   Profits were shared equally within "the company."

The conspirator goes on to state that Son Nguyen gave instructions (Page 4), Dat and Son did various "wallets." (Page 4).  And the conspirator reported to Son. (Page 4).

Importantly, the conspirator notes "there was a meeting every month regarding the Adderall business.  **Dat Nguyen went over the amounts for each person and he had an Excel spreadsheet for everyone's numbers.**"  Report Number 2 at bottom of Page 7 over to top of Page 8.

This was a short and unorganized conspiracy.   People had changing roles from getting the pills, to training, to distribution, to keeping the books, to even "stealing" company money for other drug ventures. Profits were split equally.  Pham was certainly in the mix but was not the leader.  Not every conspiracy or venture has a "leader."  This was the case here.   A decision on leadership is really the difference between a manageable and fair sentence of 46 months versus a 120 month mandatory minimum.  On these facts, the suggestion of a leadership enhancement by probation should be declined.

When Tyler spoke to the government, he plainly stated his own participation but also made clear this was a shared enterprise over a relatively short period of time.  *See* Pham Interview Report.

There is no doubt others (Hoang and Dat Nguyen and Son) tried to deflect from their own actions by putting more on Tyler, please remember that two of these guys also traveled to Vietnam and then left Tyler there to return here and cooperate against him.

**Obstruction Enhancement**

As noted, the others who went to Vietnam and then returned to surrender did not receive an obstruction enhancement.  There was no pending case against Tyler when he left.  Tyler got in touch with the undersigned and wanted to turn himself in, but the onset of Covid and lack of travel documents delayed his return.  Counsel was in touch with the government as far back as October of 2020 and it took a great deal of work to get Tyler travel documents. Tyler made his way (not in custody) from Vietnam to Tokyo to Dulles Airport where he turned himself in and was released on bond.  It does not seem any obstruction enhancement is warranted under these circumstances.

**Personal Characteristics**

Tyler has no record and has never been incarcerated.  Despite his ridiculous decision to leave prior to a case being filed against him and his participation in this five/six month case, he has lived a good life. The letters attached to this pleading—many from respected members of the community—speak to the type of individual now before the Court. Since his release on bond, Tyler has taken care of his kids and established his family ties once again.  He takes his son to practice

every single night. His kids have enjoyed having him around during these formative years.

If Tyler had forced this issue and gone to trial, the United States would have needed to writ in prisoners from around country to testify in the midst of Covid concerns.  Tyler's acceptance is noteworthy and sincere.  Everyone knows Tyler will go to prison to pay for his actions.  However, taking Tyler from his kids for more than 46 months would be extreme and not necessary pursuant to the Section 3553 factors.   We simply ask the Court to review these letters and give Tyler a just and humane sentence.

## Conclusion

46 months is enough and in line with all the other sentences. We ask that Tyler receive 46 months with a voluntary surrender to a facility close to home with a recommendation for any and all programs including the 500 hour drug treatment program and home confinement when eligible.

Tyler Pham

By Counsel

_

_____/s_____

Frank Salvato

1203 Duke Street

Alexandria, Virginia 22314

703-548-5000

Frank@Salvatolaw.com

Bar No. 30453

### Certificate of Service

A copy of the foregoing was filed with the Court's electronic filing system which system will then send a notice of the Office of the U.S. Attorney on this 22nd day of June, 2022.

_____/s_____

Frank Salvato

1203 Duke Street

Alexandria, Virginia 22314

703-548-5000

Frank@Salvatolaw.com

Bar No. 30453